IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

ERIC YOUNG,

                Plaintiff,

v.                                                              CIVIL ACTION NO. 5:16-cv-09788

ACT FAST DELIVERY OF
WEST VIRGINIA, INC., et al.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed the *Plaintiffs' Motion for Partial Summary Judgment Against the Omnicare Defendants* (Document 205) and *Memorandum of Law in Support* (Document 206), *The Omnicare Defendants' Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment* (Document 221), the *Reply in Support of Plaintiffs' Motion for Partial Summary Judgment Against the Omnicare Defendants* (Document 235), and all attached exhibits. The Court has also reviewed *The Omnicare Defendants' Motion for Summary Judgment* (Document 208), *The Omnicare Defendants' Brief in Support of Their Motion for Summary Judgment* (Document 209), the *Plaintiffs' Response to the Omnicare Defendants' Motion for Summary Judgment* (Document 219), *The Omnicare Defendants' Reply in Support of Their Motion for Summary Judgment* (Document 236), and all attached exhibits. For the reasons stated herein, the

1

Court finds that the Plaintiffs' motion for partial summary judgment should be granted and the Omnicare Defendants' motion for summary judgment should be denied.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The named Plaintiff, Eric Young, initiated this suit by filing a Collective Action Complaint (Document 1) with this Court on October 17, 2016. The Plaintiff named as Defendants Act Fast Delivery of West Virginia, Inc., a West Virginia corporation, Act Fast Delivery, Inc., a Texas corporation, Home Care Pharmacy, LLC, a Delaware corporation doing business as a variety of entities including Omnicare of Nitro and Omnicare of Nitro, West Virginia, Compass Health Services, LLC, a West Virginia corporation doing business as a variety of entities including Omnicare of Morgantown and Omnicare of Morgantown, West Virginia, Omnicare, Inc., a Delaware corporation and other John Doe Defendants. In the complaint, the Plaintiffs allege violations of state and federal wage payment laws, including the Fair Labor Standards Act and the West Virginia Wage Payment and Collection Act. The Plaintiffs specifically allege that the Defendants intentionally misclassified the named Plaintiff and other similarly situated individuals as independent contractors when they were, in fact, employees to avoid paying them time-and-a-half rates for hours worked in excess of forty (40) hours per week, in violation of 29 U.S.C. § 207 and 29 C.F.R. § 778.111.

The Defendant Omnicare, Inc. is a pharmaceutical company that "sells and delivers medications, mostly to nursing homes and long-term care facilities." (Pls.' Mem. of Law in Support at 3). Omnicare works with these facilities to serve as their pharmacy and provide the facility's prescription drug needs through a delivery service. Typically, a facility enters into a contract with Omnicare and, as part of the contract, Omnicare establishes its price package to

include the delivery service. In other words, the price the long-term care facility pays Omnicare includes the delivery service such that it is "Omnicare who suffers all delivery cost[s]." (*Id.*) In order to carry out this service, Omnicare "utilizes different independent delivery service companies to deliver pharmaceuticals to its long-term care clients." (Omnicare Defs.' Brief in Support at 2.) In 2012, and again in 2015, Omnicare contracted with Act Fast to serve as its delivery courier from Omnicare's West Virginia pharmacies. Over the course of their relationship, 90% of Act Fast's business was generated in deliveries for Omnicare. (Laura Hick's Depo. at 23.)

Upon accepting Act Fast's bid to serve as its courier, Omnicare and Act Fast entered into a Courier Agreement (Pls.' Mem. of Law in Support, Ex. 2) (Document 205-2). The agreement stated that neither Act Fast nor its courier drivers were employees of Omnicare, but were independent contractors. (*Id.* at ¶ 34.) The agreement also stated as follows:

> Courier will operate its business and perform the Courier Service for Pharmacy independent of the Pharmacy and Omnicare. Courier's responsibilities in operating its business . . . include being solely responsible for: all staffing, labor, personnel and human resource functions; managing and directing the transportation functions and the drivers performing the Courtier services; and determining the methods, means, and manner of performing the pickup and delivery of products. . . ." (*Id.*)

In spite of the independent contractor language, however, the agreement set forth many specific requirements that Act Fast was required by Omnicare to follow in order to adequately satisfy its duties. Omnicare used the Courier Agreement to establish precisely where and when Act Fast's drivers made their deliveries. Schedules attached to the agreement specifically mandated the different facilities of Omnicare customers to which the delivery drivers would deliver products, and established the routes, order of stops, and the times deliveries were to be made to each of these facilities. Omnicare established these routes and route times based on their

3

customer's needs concerning medications so as to ensure their customers could provide medications to their patients on schedule. The Courier Agreement specifically laid out these details and provided that they were "subject to modifications by the pharmacy." (*Id.* at ¶ 2.) Based on the Courier Agreement, the routes, stops, and delivery times were non-negotiable, and Omnicare "acknowledges that it controlled the where, when, and how Act Fast couriers made deliveries." (Omnicare Defs.' Response in Opp. at 3.)

The agreement required the drivers to pick up deliveries from the pharmacy in totes owned and marked by Omnicare and return the empty totes to Omnicare's facility. (Document 205-2 at ¶ 2.) It required that all delivery vehicles be "appropriately configured" and prohibited the use of "pickup trucks with camper shells." (*Id.* at ¶ 12.) It also required Act Fast's drivers to be HAZMAT trained, wear uniforms during deliveries with photographic identification clearly visible, and use coolers for the storage and transportation of certain packages as Omnicare saw fit. (*Id.*; Document 205-1 at 4, ¶ 4.) In the 2012 iteration of the agreement, Omnicare required Act Fast to "ensure drivers look, smell, and act professionally" and to "deal with poor driver conduct swiftly." (Document 205-1 at 19, ¶ 7.) It further required Act Fast to "monitor drivers to make sure they follow the routes as planned" and "[e]nsure STAT drivers leave the pharmacy promptly and go straight to their destinations." (*Id.* at 19, ¶ 14.)

The named Plaintiff, Mr. Young, began working for Act Fast as a delivery driver in 2012. When applying for the job, Mr. Young filled out an application to be a delivery driver for Act Fast. (Eric Young Depo. at 30:12--31:15.) As was mandated by Omnicare in the Courier Agreement, Act Fast administered the background check and drug test that Mr. Young and other drivers were required to take. (*Id.* at 185.) The Plaintiff and other drivers drove their own automobiles when

making deliveries, and Act Fast also provided Mr. Young with the scanner to use while making deliveries and required him to pay for and wear a shirt with Act Fast's logo on it. (*Id.* at 22:15-18.) Mr. Young and other delivery drivers drove both regularly-scheduled routes and "STAT" deliveries, or deliveries that were urgently needed by the facility, and the drivers could choose whether to accept or reject the STAT delivery assignment. (*Id.* at 146:8-18.)

Mr. Young did not receive his paychecks from Omnicare and was solely compensated by Act Fast. (*Id.* at 23:21-22.) Act Fast calculated all of its drivers' deliveries over each two-week period, including normal delivery routes and STAT deliveries, and invoiced Omnicare for the charges. Act Fast paid Mr. Young and the other drivers a set fee per route in lump sum payments. Thus, Mr. Young's pay varied based on the amount of deliveries he decided to take. (Eric Young Depo. at 57:21-58:5.) Omnicare did not make any deductions from Mr. Young's paychecks, nor did it provide Mr. Young with an IRS W-2 or 1099 form concerning his income taxes or provide any benefits of any kind. (*Id.* at 220:24-221:4.) Further, Mr. Young was trained by Act Fast employees or management and was supervised by Act Fast. Act Fast issued his performance evaluations and at one point during his employment promoted him to "head driver." (*Id.* at 187:19-188:4.)

However, the Courier Agreement allowed Omnicare, if "unsatisfied with [Act Fast's] service" to "notify [Act Fast] in writing" and give Act Fast "seven days to rectify the service problem." (Document 205-2 at ¶ 19.) When Omnicare suggested employment decisions, Act Fast regularly followed through with them. For example, upon receipt of complaints from Omnicare customers, Act Fast regional manager Laura Hicks followed up with Omnicare employee Chris Lockard concerning those complaints and informed him that three drivers would

be terminated in response to Omnicare's communication regarding complaints and appropriate action. (Pls.' Mot. for Sum. Judg., Ex. 13.) Ms. Hicks specifically requested Omnicare's input on "concerns or requests with the changes [Omnicare] plan[s] on making." (*Id.*)

On July 4, 2015, Mr. Young's contract as a delivery driver was terminated by Act Fast. (*Id.* at 94.) This action followed Mr. Young's termination. Both the Plaintiffs and the Omnicare Defendants filed their summary judgment motions on November 15, 2017. Both parties replied to the cross motions on November 29, 2017, and both parties filed their replies on December 6, 2017. The cross motions for summary judgment are therefore fully briefed and ripe for review.

## STANDARD OF REVIEW

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014). A "material fact" is a fact that could affect the outcome of the case. *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). A "genuine issue" concerning a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News & Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp.*,

477 U.S. at 322–23. When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party. *Hoschar*, 739 F.3d at 169. However, the non-moving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. "At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action." *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at *3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of credibility. *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va. Mar. 31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250. If, however, the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.

When presented with motions for summary judgment from both parties, courts apply the same standard of review. *Tastee Treats, Inc. v. U.S. Fid. & Guar. Co.*, 2008 WL 2836701 (S.D. W. Va. July 21, 2008) (Johnston, J.) *aff'd,* 474 F. App'x 101 (4th Cir. 2012). Courts "must review

each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law," resolving factual disputes and drawing inferences for the non-moving party as to each motion. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citations omitted); *see also Monumental Paving & Excavating, Inc. v. Pennsylvania Manufacturers' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999).

## APPLICABLE LAW

Pursuant to the Fair Labor Standards Act ("FLSA"), an entity is required to pay its employees a federal minimum wage and to pay "a rate not less than one and one-half time the regular rate" to employees who work more than forty hours in a single work week. 29 U.S.C. §§ 206(a), 207(a)(1). In an effort to better the harsh realities suffered by workers when the FLSA was passed, Congress very broadly defined "employ" in the FLSA as "to suffer or permit to work," and defined "employee" as "any individual employed by an employer." 29 U.S.C. §§ 203(g) and (e)(1). Congress further used broad language to define "employer" under the Act as "any person acting directing or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). These broad definitions were used in order that the FLSA might cover workers "'who might not qualify as employees under a strict application of traditional agency law principles' or under other federal statutes." *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 133 (4th Cir. 2017) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)).

According to Department of Labor regulations, "[a] single individual may stand in the relation of an employee to two or more employers at the same time under the Fair Labor Standards Act of 1938, since there is nothing in the act which prevents an individual employed by one employer from also entering into an employment relationship with a different employer."

8

*Salinas*, 848 F.3d at 133 (quoting 29 C.F.R. § 791.2(a)). From this regulation arose the joint employment doctrine, which holds that "separate entities 'that share control over an individual worker may be deemed joint employers.'" *Dalton v. Omnicare, Inc.*, 138 F.Supp.3d 709, 717 (N.D. W.Va. 2015) (quoting *Schultz v. Capital Intern. Security, Inc.*, 466 F.3d 298, 305 (4th Cir. 2006)). "Separate employment exists when . . . 'two or more employers are acting *entirely independently* of each other and are *completely disassociated* with respect to' the individual's employment." *Salinas*, 848 F.3d at 133-34 (emphasis in original). "By contrast, joint employment exists when 'the facts establish . . . that employment by one employer is *not completely disassociated* from employment by the other employer.'" *Id.* at 134 (emphasis in original).

Courts have long struggled to develop a singular and articulate test for determining when two or more entities are joint employers for the purposes of the FLSA, leading to the use of different factors amongst the several circuits. The Fourth Circuit recently examined the joint employment issue, however, and held that the set of factors established by the Ninth Circuit in *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983) and commonly relied on by district courts should no longer be used. *Salinas*, 848 F.3d at 137 ("We agree that Bonnette's reliance on common-law agency principles does not square with Congress's intent that the FLSA's definition of 'employee' encompass a broader swath of workers than would constitute employees at common law . . . Accordingly, courts should not rely on the *Bonnette* factors . . . .").

After examining the history of the joint employment doctrine, the Fourth Circuit established its own definitive joint-employment test. In *Schultz v. Capital Intern. Security, Inc.*, the court had previously "established a two-step framework for analyzing FLSA joint employment

9

claims, under which courts must first determine whether two entities should be treated as joint employees and then analyze whether the worker constitutes an employee or an independent contractor . . . ." *Salinas*, 848 F.3d at 139-40. The *Salinas* court affirmed that two-step framework and, concerning the first step, pinpointed the issue to "one fundamental question: whether two or more persons or entities are not completely disassociated with respect to a worker such that the persons or entities share, agree to allocate responsibility for, or otherwise codetermine—formally or informally, directly or indirectly, the essential terms of the worker's employment." *Id.* at 141. In order to answer this question, the court established six factors for lower courts to consider:

> (1) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker, whether by direct or indirect means;
>
> (2) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms or conditions of the worker's employment;
>
> (3) The degree of permanency and duration of the relationship between the putative joint employers;
>
> (4) Whether, through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer;
>
> (5) Whether the work is performed on a premise owned or controlled by one or more of the putative joint employers, independently or in connection with one another; and
>
> (6) whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials

> necessary to complete the work.

*Id.* at 141-42. The *Salinas* Court determined that these factors constituted a non-exhaustive list, and that "'the ultimate determination of joint employment must be based upon the circumstances of the whole activity.'" *Id.* at 142 (quoting *Schultz*, 466 F.3d at 306).

Once it is determined whether the entities in question are not completely disassociated such that they should be considered joint employers, courts must then turn to whether the worker in question is an employee or an independent contractor. "'In determining whether a worker is an employee covered by the FLSA [as opposed to an independent contractor], a court considers the 'economic realities' of the relationship between the worker and the putative employer' or employers, in the event the worker is jointly employed." *Salinas*, 848 F.3d at 150 (quoting *Schultz,* 466 F.3d at 304). Thus, "[w]hen a worker is economically dependent on a putative employer—or . . . his putative joint employers—he qualifies as an employee protected by the FLSA. By contrast, a worker whose profit or loss depends upon his own creativity, ingenuity, and skill is an independent contractor outside of the FLSA's scope." *Id.* (citing *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947)).

In order to resolve this employee or independent contractor question, the *Salinas* court again prescribed six factors courts should look to: "(1) the degree of control that the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business." *Id.*

**DISCUSSION**

Both the Plaintiffs and the Omnicare Defendants seek summary judgment regarding the status of Act Fast and Omnicare as joint employers under the FLSA. The Court will therefore first examine whether the two entities are joint employers, and then analyze whether the Plaintiffs constitute employees or independent contractors.

A. *Joint Employers*

The Plaintiffs first contend that Act Fast and Omnicare are joint employers in the FLSA context because "Omnicare is by no means 'completely disassociated' from the [Plaintiffs'] employment." (Pls.' Mem. in Supp. of Sum. Judg. at 9.) According to the Plaintiffs, nearly every factor used by the *Salinas* court weighs in favor of finding that Omnicare jointly employed the Plaintiff drivers. The Plaintiffs point out that, regardless of the independent contractor language in the Courier Agreement, the drivers went to the Omnicare facilities at times Omnicare established. Omnicare directed the precise routes the drivers had to deliver on and established specific requirements for drivers to comply with at all times, including the type of automobile the drivers were permitted to use when making deliveries. The Plaintiffs further point out that Omnicare had indirect power to make employment decisions regarding the Plaintiff drivers and would direct Act Fast to make decisions concerning the drivers if complaints were received from clients. The Plaintiffs also argue that Omnicare relied only on Act Fast and its drivers for all of its West Virginia business, and that Omnicare was the source of more than ninety percent of Act Fast's business.

While Omnicare does not contest these facts, it counters that it was not a joint employer of the Plaintiffs under the law. Omnicare asserts that the language of the Courier Agreement

specifically establishes that the Plaintiffs were independent contractors of Act Fast and were not employed by Omnicare. Omnicare argues that the Plaintiffs drove their own vehicles, used scanners provided by Act Fast to record their deliveries, and wore uniforms with Act Fast's logo on them. Omnicare claims that, although the Courier Agreement does require specific routes and delivery times, the Plaintiff drivers could choose which routes they drove and whether or not to accept STAT deliveries. Omnicare argues that it had no authority "to hire, train, schedule, supervise, discipline, pay or fire Act Fast couriers." (Omnicare Defs.' Response in Opp. at 1.) Omnicare contends that it was Act Fast that trained, monitored, and paid the Plaintiffs, and to the extent Omnicare did have any role in the Plaintiffs' jobs, it was merely supervisory and done so with an eye toward ensuring Omnicare's compliance with all federal rules and regulations regarding the sale and delivery of pharmaceuticals. Thus, Omnicare asserts that the *Salinas* factors do not weigh in favor of finding it a joint employer of the Plaintiffs.

In considering the totality of the uncontested facts provided by the Plaintiffs and Omnicare in light of the *Salinas* factors, the Court finds that there is no genuine issue of material fact that Omnicare and Act Fast jointly employed the Plaintiffs. Regarding the first factor, Act Fast and Omnicare jointly directed, supervised, and controlled the Plaintiffs. Omnicare acknowledges that it "controlled the where, when, and how Act Fast couriers made deliveries." (Omnicare Defs.' Response in Opp. at 3.) Omnicare prepared the daily schedules for the Plaintiffs and determined what routes would be driven and the times deliveries were to occur. Omnicare forbade drivers from using pickup trucks as delivery automobiles and required that the Plaintiffs wear uniforms with Act Fast's logo.[1] The Courier Agreement even went so far as to dictate how the Plaintiffs

---

1 Omnicare's argument that this fact weighs in its own favor because it did not require the Plaintiffs to wear their own logo lacks merit. While it is uncontested that the Courier Agreement required the delivery drivers to wear a shirt with

13

looked, smelled, and acted when making deliveries. This amount of control exercised by Omnicare clearly amounts to the ability to direct and control the Plaintiffs. This first factor weighs in favor of a finding that Omnicare and Act Fast were not completely disassociated regarding the Plaintiffs' employment.

Secondly, while Act Fast was mainly responsible for delivery driver job applications and the mechanisms involved in hiring and firing employees, Omnicare shared in the power and ability to fire drivers or modify the terms and conditions of their employment. The Plaintiffs have presented uncontested evidence that, upon receiving complaints from its clients regarding deliveries, Omnicare directly communicated to Act Fast its wishes to have those drivers reassigned or terminated. Further, pursuant to the Courier Agreement, Omnicare had the ability to modify delivery schedules on its own volition, and those schedules were non-negotiable by the Plaintiffs. Thus, while Act Fast may have directly hired and fired employees and administered drug tests and training, the undisputed facts show that Omnicare, at a minimum, jointly shared with Act Fast the ability to address delivery driver issues or modify the terms and conditions of their employment as it saw fit. As a result, the second factor also weighs in favor of a finding that Omnicare and Act Fast were not entirely independent or completely disassociated.

Next, regarding factors three and four,[2] the parties have presented no evidence that Omnicare owned Act Fast. However, Act Fast's previous manager, Laura Hicks, testified that ninety percent of Act Fast's business in West Virginia came from Omnicare. (Hicks Depo. at

---

the Act Fast logo on it, the fact remains that Omnicare still required the Plaintiffs to wear a specific uniform with a specific logo. The fact that Omnicare required Act Fast's logo as opposed to its own does not diminish its act of control over the Plaintiffs.

2 In *Salinas*, the Fourth Circuit examined the third and fourth factors (duration of the relationship between the putative joint employers and whether one putative joint employer controls or is controlled by the other) simultaneously. See, *Salinas*, 848 F.3d at 147. Because these two factors are closely related, the Court follows the *Salinas* Court's lead and does the same type of analysis here.

14

23:19.)  Further, upon Omnicare's award of its delivery contract to a different business in 2017, Act Fast's West Virginia operations shut down completely.  Therefore, the evidence presented supports a finding that, while no direct ownership interest existed, Act Fast and Omnicare did maintain a relationship such that Act Fast was almost completely dependent on Omnicare for its business.

With respect to the fifth factor, the Plaintiffs mainly worked from their own automobiles as they made deliveries.  The Plaintiffs do argue that Omnicare leased space to Act Fast at its West Virginia facilities in order to create a driver waiting area where the Plaintiffs picked up packages for delivery.  However, the majority of the Plaintiffs' work was not performed on premises owned by either Omnicare or Act Fast.

Finally, regarding the sixth factor, it is uncontested that Omnicare did not issue pay checks or handle payroll taxes or insurance of any form.  Omnicare did require the Plaintiffs to use Omnicare-provided totes and coolers in making deliveries.  However, Act Fast provided the scanners Plaintiffs were required to use.

Omnicare asserts that, although these factors weigh in favor of finding joint employment, it was disassociated from Act Fast such that it was not Act Fast's joint employer under the FLSA.  According to Omnicare, its requirements in the Courier Agreement were in place to assure quality control and to ensure compliance with state and federal laws and regulations.  The Court is not persuaded by this argument, however.  As the Fourth Circuit found in *Salinas*, Omnicare's actions here went well beyond "double-checking to verify that the task was done properly."  *Salinas*, 848 F.3d at 148.  In *Salinas*, the putative joint employer "engaged in daily oversight of the Plaintiffs' work and provided regular feedback" and regularly provided specific instructions on how the

plaintiffs were to complete projects, including the methods they should use. *Id.* Omnicare exerted a similar level of control here. Omnicare dictated what kind of automobile the Plaintiffs could drive, precisely where and when deliveries were to be made, and even how the Plaintiffs were to look and smell upon making deliveries. These uncontested facts exceed mere quality control and the assurance of compliance with federal regulations.[3]

Based on the entirety of the undisputed facts before the Court, and viewing each party's motion in the light most favorable to the non-moving party, no genuine issue of material fact exists as to Omnicare's joint control over the Plaintiffs' work. Pursuant to the *Salinas* factors, Omnicare was not completely disassociated with Act Fast in terms of the Plaintiffs' employment and was, therefore, the Plaintiffs' joint employer.

### B. *Employee or Independent Contractor Analysis*

Having found that Omnicare and Act Fast were indeed joint employers of the Plaintiffs, the Court now turns to the second step of the joint employment framework to consider whether the Plaintiffs were employees of Act Fast and Omnicare or independent contractors.

For many of the same reasons as previously set forth, the Plaintiffs argue that they were employees of Act Fast and Omnicare rather than independent contractors. The Plaintiffs point out that Omnicare exercised a great deal of control over their work, including providing daily schedules of precisely where the drivers were to deliver and forbidding them to perform other, non-Omnicare deliveries during Omnicare route assignments. The Plaintiffs argue that their

---

3 As the Fourth Circuit did in *Salinas*, the Court notes that every instance of a delivery courier relationship does not automatically lead to a finding of joint employment. If an entity ensures it is hiring a trustworthy courier, it can easily disassociate itself from the courier's control over its employees while conducting enough oversight to ensure quality control. Here, however, in examining the "circumstances of the whole activity," *Schultz*, 466 F.3d at 306, it is clear that Omnicare engaged in more than just quality control oversight.

income was nearly completely dependent on Omnicare, that their personal investment in their labor was nearly nonexistent, that they required no specialized skill to perform their work and that their delivery work was necessary for Omnicare to perform its business. Thus, the Plaintiffs argue that nearly all six factors weigh in their favor such that they are employees of Omnicare and Act Fast as opposed to independent contractors.

Omnicare counters that the Plaintiffs' work was done completely independent of it. Omnicare argues that it had no control over the Plaintiffs' day-to-day work, the Plaintiffs used their own equipment or equipment provided by Act Fast, the Plaintiffs applied to work directly for Act Fast and received all paychecks from Act Fast and, by Mr. Young's own admission, he filed his taxes as though he were an independent contractor. Omnicare therefore asserts that the Plaintiffs must be independent contractors rather than employees.

The Court finds that no genuine issue of material fact exists which supports a finding that the Plaintiffs were not employees of Act Fast and Omnicare. In both *Schultz* and *Salinas*, the Fourth Circuit explained that the "focal point" for determining whether a worker is an employee or an independent contractor is "whether the worker 'is economically dependent on the business to which he renders service or is, as a matter of economic reality, in business for himself.'" *Salinas*, 848 F.3d at 150 (quoting *Schultz*, 466 F.3d at 304). "Generally, '[w]here putative employers provide specific direction for how workers, particularly low-skilled workers, are to perform their jobs, courts have weighed the control factor in favor of employee status.'" *Scruggs v. Skylink, Ltd.*, No. CIV.A. 3:10-0789, 2011 WL 6026152, at *3 (S.D.W. Va. Dec. 2, 2011) (Chambers, J.). Here, as previously stated, Omnicare through its Courier Agreement with Act Fast exercised a great deal of control over the Plaintiffs, down to what they were required to wear

17

and how they were to smell, look, and act when they made deliveries. Thus, the first factor alone is enough to satisfy the focal point in *Schultz* in the Plaintiffs' favor.

Other factors weigh in the Plaintiffs' favor as well. Concerning the second factor, the Plaintiffs' opportunities to profit were nearly entirely dependent on Omnicare and Act Fast because Omnicare, through its Courier Agreement, dictated the routes to be driven by the Plaintiffs and forbade them to conduct any other deliveries while running these routes. Further, the Plaintiffs' investment in equipment or material was nearly nonexistent. The only investments made by the Plaintiffs were owning their own automobile, something they almost certainly would have done regardless of their employment by Act Fast and Omnicare, and the uniform that Omnicare dictated they wear when making deliveries. Act Fast, at Omnicare's behest, provided all other equipment. The degree of skill required to perform the job was minimal—the Plaintiffs had to have a driver's license and the ability to use a scanner, which was later replaced by the use of a smart phone. (Young Depo. at 38:15—39:21.) Finally, the Plaintiffs' service was so integral that Omnicare's business could not have functioned without it. Omnicare's specific business was delivering pharmaceuticals directly to its clients. Without these drivers, no pharmaceutical products would have been delivered. No reasonable jury considering the undisputed facts could find that the Plaintiffs were independent contractors.

In sum, "joint employment exists when (1) two or more persons or entities share, agree to allocate responsibility for, or otherwise codetermine—formally or informally, directly or indirectly—the essential terms and conditions of a worker's employment and (2) the two or more persons' or entities' combined influence over the terms and conditions of the worker's employment render the worker an employee as opposed to an independent contractor." *Salinas*, 848 F.3d at

151. Given the undisputed facts of this case and the appropriate precedent, Omnicare has failed to present evidence to create a genuine issue of material fact that Act Fast and Omnicare jointly employed the Plaintiffs for the purposes of the FLSA, and judgment as a matter of law in the Plaintiffs' favor is, therefore, appropriate.

## CONCLUSION

WHEREFORE, after thorough review and careful consideration, the Court **ORDERS** that the *Plaintiffs' Motion for Partial Summary Judgment Against the Omnicare Defendants* (Document 205) be **GRANTED** and that *The Omnicare Defendants' Motion for Summary Judgement* (Document 208) be **DENIED.**

The Court **DIRECTS** the Clerk to send a certified copy of this Order to counsel of record and to any unrepresented party.

ENTER: January 3, 2018

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA